24CA1059, 24CA1921 & 25CA1894 Green v US Anesthesia 02-12-2026

COLORADO COURT OF APPEALS

---

Court of Appeals Nos. 24CA1059, 24CA1921 & 25CA1894
Arapahoe County District Court No. 22CV32181
Honorable Don J. Toussaint, Judge

---

Richard Brandt Green, M.D.,

Plaintiff-Appellee and Cross-Appellant,

v.

U.S. Anesthesia Partners of Colorado, Inc., f/k/a Greater Colorado Anesthesia, and U.S. Anesthesia Partners, Inc.,

Defendants-Appellants and Cross-Appellees.

---

APPEAL DISMISSED IN PART, JUDGMENT AND ORDER AFFIRMED,
AND CASE REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE GOMEZ
Pawar and Bernard*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 12, 2026

---

Foley & Lardner LLP, Tamera D. Westerberg, Kelsey C. Boehm, Stephanie Adamo, Denver, Colorado; Gokenbach Law, LLC, Jennifer L. Gokenbach, Denver, Colorado for Plaintiff-Appellee and Cross-Appellant

Davis Graham & Stubbs LLP, Theresa Wardon Benz, Molly Kokesh, Kylie Ngu Putnam, Denver, Colorado, for Defendants-Appellants and Cross-Appellees

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     In this consolidated appeal, defendants, U.S. Anesthesia Partners of Colorado, Inc. (USAP-Colorado) and U.S. Anesthesia Partners, Inc. (USAP-National), appeal the trial court's entry of judgment in favor of plaintiff, Dr. Richard Brandt Green, after a jury found that defendants breached the duty of good faith and fair dealing in their contracts with Dr. Green and awarded Dr. Green $1.9 million in damages.  Defendants also appeal the trial court's order awarding attorney fees and costs to Dr. Green.  And Dr. Green cross-appeals the trial court's denial of his post-trial motion after sixty-three days by operation of C.R.C.P. 59(j).

¶ 2     We dismiss Dr. Green's cross-appeal because we conclude that there was no final judgment before the trial court ruled on his post-trial motion and, therefore, the motion was not deemed denied under Rule 59(j).  As to defendants' appeals, we affirm the judgment and the order awarding attorney fees and costs.  We also remand the case to the trial court to determine the amount of appellate attorney fees and costs to be awarded to Dr. Green.

## I.    Background

¶ 3    Dr. Green is a board-certified anesthesiologist who has been licensed to practice medicine since 1992.  He practiced for several years with a group that became Greater Colorado Anesthesia (GCA).

¶ 4    Then, in early 2015, USAP acquired GCA.[1]  In conjunction with the acquisition, Dr. Green executed a partner agreement and a stock agreement.

¶ 5    Under the partner agreement, which had a five-year term, Dr. Green agreed to provide anesthesiology services as a full-time physician-partner and to participate in an on-call rotation for emergency services.  Section 2.4 of the agreement required him to "successfully apply for and maintain in good standing provisional or active medical staff privileges at the [f]acility or [f]acilities to which [he] is assigned by GCA," and section 6.2.5 allowed GCA (or its successor or assign) to terminate him based on a "loss or reduction of medical staff privileges for cause at any of the [f]acilities to which [he] is assigned."  The agreement didn't specify which facility or

---

[1] We address the relationship between GCA and the two USAP entities that are parties to this case (USAP-National and USAP-Colorado) in Part VII below.  For purposes of this background, we use the generic "USAP," as most of the witnesses did at trial.

facilities Dr. Green was assigned to, and the parties disputed whether he was ever assigned to any facilities within the meaning of section 2.4. He had privileges at several facilities, and the parties presented conflicting testimony as to which and how many of those were facilities at which he regularly worked.

¶ 6 In connection with the merger, Dr. Green was issued more than 300,000 shares of unvested stock. That stock would vest after five years under the terms of the stock agreement.

¶ 7 Years earlier, Dr. Green had self-reported an alcohol problem to the Colorado Physician Health Program (CPHP) and, at CPHP's direction, had completed an inpatient rehabilitation program. Thereafter, he entered into a series of agreements with CPHP that required him to abstain from alcohol. In 2015, he tested positive for alcohol twice, resulting in his medical license being suspended for four days in November 2015.

¶ 8 Dr. Green took an approved medical leave of absence from his practice from November 2015 to March 2016. Shortly after his return, he was diagnosed with alcohol use disorder and autism.

¶ 9 Due to the four-day suspension of his license, Dr. Green automatically lost his practice privileges at most of the facilities

where he'd previously worked. By the time he returned to work in March 2016, he had regained privileges at four facilities. After his return, he continued to work on regaining privileges at the other facilities and eventually did so at a few more of them.

¶ 10    Upon Dr. Green's return to work, he started getting paid at an hourly rate rather than under the established partner formula. When he asked why, he was told it was because he was more limited in the facilities where he could work.

¶ 11    In August 2016, USAP notified Dr. Green by letter that it was terminating the partner agreement, and thus his status as a partner, due to his inability to maintain privileges at the facilities he'd been assigned to. The letter also stated that under the terms of the stock agreement, "because [his] employment as a Physician-Partner [was being] terminated based on a termination of privileges/credentialing, any [c]ommon [s]tock issued to [him] will be forfeited and will not vest."

¶ 12    Dr. Green then applied for long-term disability benefits. That application was denied. He also requested designation of his termination from the partnership as due to his "disability" under section 6.2.4 of the partner agreement, which, under the terms of

the partner agreement and the stock agreement, would allow him to retain his unvested stock. That request, too, was denied.

¶ 13 Dr. Green nonetheless continued working as an employee for USAP for another two years.

¶ 14 In 2018, Dr. Green sued defendants in federal court, alleging claims for disability discrimination, retaliation, and breach of contract. *Green v. U.S. Anesthesia Partners of Colo., Inc.*, 624 F. Supp. 3d 1201, 1208-09 (D. Colo. 2022). The federal district court granted summary judgment in favor of defendants on the discrimination and retaliation claims and declined to exercise supplemental jurisdiction over the breach of contract claim. *Id.* at 1226. Dr. Green appealed to the Tenth Circuit, which affirmed. *Green v. U.S. Anesthesia Partners of Colo., Inc.*, No. 22-1319, 2023 WL 7015660, at *1 (10th Cir. Oct. 25, 2023) (unpublished opinion).

¶ 15 A month after Dr. Green filed the federal lawsuit, USAP terminated his employment. In a letter, USAP stated that he was terminated based on an accusation of sexual harassment at one of the facilities where he provided services.

¶ 16 Dr. Green then filed this state court action, asserting claims for breach of contract and breach of the implied covenant of good

5

faith and fair dealing. Following a trial, a jury rejected the breach of contract claims but found in favor of Dr. Green and against both defendants on the good faith and fair dealing claims. The jury awarded Dr. Green $1.9 million in damages against USAP-National but left blank the section on damages as to USAP-Colorado.

¶ 17 All the parties filed post-trial motions, with defendants asserting various reasons why the jury verdict was invalid and Dr. Green asking the court to modify the judgment to reflect that USAP-Colorado owed him $1 in nominal damages. In an order entered 116 days later, the trial court denied defendants' motion and granted Dr. Green's.

¶ 18 Dr. Green and USAP-Colorado both requested awards of attorney fees and costs. The trial court found that Dr. Green is the prevailing party and accordingly granted his request, denied USAP-Colorado's, and awarded him attorney fees and costs.

¶ 19 Defendants raise the following challenges to the judgment: (1) issue preclusion bars Dr. Green's claims in this case based on the outcome of the earlier federal litigation; (2) the implied covenant of good faith and fair dealing doesn't apply to the subject contracts because they relate to Dr. Green's employment; (3) Dr. Green can't

prevail on his good faith and fair dealing claims because he didn't pursue any theories involving defendants' exercise of discretionary authority under the contracts; (4) Dr. Green can't prevail on these claims for the additional reason that he didn't present sufficient evidence to show that he substantially performed or was excused from performance of the partner agreement; (5) errors in the jury instructions and verdict form regarding Dr. Green's need to prove substantial performance require a new trial; (6) Dr. Green's claims against USAP-National fail because it is not a party to the subject contracts; and (7) the trial court erred by entering judgment against USAP-Colorado for $1. Dr. Green's cross-appeal likewise relates to the seventh issue. And finally, defendants challenge the trial court's order awarding attorney fees and costs to Dr. Green. We address each of these issues in turn.

## II. Issue Preclusion

¶ 20 We first consider defendants' assertion that, due to the outcome of the earlier federal litigation, issue preclusion requires judgment in their favor. We disagree.

## A. Preservation

¶ 21    The parties dispute whether defendants preserved this issue. We are satisfied that defendants preserved the issue by obtaining a definitive ruling on it through the trial court's denial of their motion in limine (in addition to the court's simultaneous ruling in its denial of summary judgment). *See State Farm Mut. Auto. Ins. Co. v. Goddard*, 2021 COA 15, ¶ 73 ("A court's definitive ruling on a motion in limine preserves the issue for appeal."). Dr. Green contends that this path for review applies only to evidentiary issues and that defendants had to raise the issue during and after trial under C.R.C.P. 50 in order to preserve it. But the issue defendants raised was an evidentiary one: whether Dr. Green was precluded from offering evidence or argument at trial that contradicted certain purported findings from the federal litigation. Accordingly, the issue was appropriately preserved through the motion in limine.

## B. Applicable Law and Standard of Review

¶ 22    Issue preclusion bars relitigation of previously decided issues in certain circumstances. *Villas at Highland Park Homeowners Ass'n v. Villas at Highland Park, LLC*, 2017 CO 53, ¶ 28. To justify application of issue preclusion, a party must show that (1) the issue

is identical to an issue that was actually litigated and necessarily adjudicated in the earlier proceeding; (2) the other party was a party to or was in privity with a party to the earlier proceeding; (3) there was a final judgment on the merits in the earlier proceeding; and (4) the other party had a full and fair opportunity to litigate the issue in the earlier proceeding. *Id.* at ¶ 29.

¶ 23 The parties' dispute relates to the first requirement — that certain issues raised in this case are identical to issues that were actually litigated and necessarily adjudicated in the federal case. An issue can satisfy this requirement even if the claims for relief are different, so long as either the facts or the legal matter is the same. *Youngs v. Indus. Claim Appeals Off.*, 2012 COA 85M, ¶ 54. However, a determination of the issue must have been necessary to the judgment in the earlier proceeding. *Madalena v. Zurich Am. Ins. Co.*, 2023 COA 32, ¶ 23. "If issues are determined but the judgment is not dependent upon the determinations, relitigation of those issues . . . is not precluded . . . ." *Id.* (quoting *Md. Cas. Co. v. Messina*, 874 P.2d 1058, 1062 (Colo. 1994)).

¶ 24    Whether issue preclusion applies is a question of law that we review de novo. *Bristol Bay Prods., LLC v. Lampack*, 2013 CO 60, ¶ 17.

C.    Analysis

¶ 25    Defendants assert that issue preclusion applies to two facts resolved in the federal case: (1) Dr. Green was contractually obligated but failed to regain privileges at certain facilities; and (2) Dr. Green was obligated by the partner agreement to take on-call work but could not meet that obligation.

¶ 26    These issues were not actually litigated and necessarily adjudicated in the federal case, which centered on Dr. Green's claims alleging disparate treatment on the basis of a disability, failure to accommodate a disability, and retaliation for engaging in protected conduct. Although the legal claims needn't be the same for issue preclusion to apply, *see Youngs*, ¶ 54, the factual issues must have been resolved and must have been necessary to the judgment in the first case, *see Madalena,* ¶ 23.

¶ 27    But any factual issues concerning Dr. Green's contract obligations — even if they were touched upon in the course of the opinions by the federal district court and the Tenth Circuit — were

not necessary to the judgment on his federal claims. Instead, as relevant here, the federal courts' resolution of Dr. Green's disparate treatment claim regarding his termination from the partnership hinged on their determination that he hadn't established a triable issue as to whether he was capable of performing the essential job functions of maintaining medical privileges at facilities and staffing on-call shifts. *See Green,* 624 F. Supp. 3d at 1210-14; *Green,* 2023 WL 7015660, at *4-5. While the federal courts may have resolved that Dr. Green was unable to perform certain essential functions of his position as a partner, that doesn't necessarily signify, as a matter of contract law, that he materially breached the partner agreement or that any such breach wasn't caused by defendants' breach of the duty of good faith and fair dealing.

¶ 28 Indeed, in declining to exercise supplemental jurisdiction over Dr. Green's contract claim, the federal district court expressed that "[a]lthough [it] ha[d] examined the [p]artner [a]greement at some length for other purposes in this case, the arguments at issue in the breach of contract claim require a degree of examination of the language of the contract beyond that which the Court has already considered that document." *Green,* 624 F. Supp. 3d at 1226.

¶ 29    Accordingly, we conclude that the trial court didn't err in denying defendants' request to apply issue preclusion in this case.

¶ 30    We also conclude that even if the trial court had erred, any error was harmless. *See* C.R.C.P. 61 ("[N]o error or defect in any ruling or order . . . is ground for [relief from a judgment], unless refusal to take such action appears to the court inconsistent with substantial justice."); *Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010) ("If an error does not affect a party's substantial right, it must be deemed harmless and is not grounds for reversal."). Because the jury rendered a general verdict, it's impossible for us to know the basis for its finding that defendants breached the duty of good faith and fair dealing. Yet Dr. Green asserted bases for these claims that were not touched upon in the federal case — specifically, that defendants breached duties relating to the *stock agreement*[2] as well as the partner agreement and in conjunction with their *decisions*

---

[2] Defendants contend that Dr. Green's good faith and fair dealing claims were based solely on the partner agreement and not the stock agreement. Not so. Throughout the case — including in the complaint and in closing argument at trial — Dr. Green referenced actions defendants took under both agreements. And the jury instructions and verdict form didn't limit the claims to just the partner agreement.

12

*regarding his disability status* as well as regarding his termination from the partnership. Thus, we cannot say that any error in the application of issue preclusion to findings about Dr. Green's duties under the partner agreement affected a substantial right.

### III. Applicability of the Implied Covenant

¶ 31 Next, we consider defendants' assertion that the implied covenant of good faith and fair dealing cannot apply to the partner agreement or the stock agreement because those agreements relate to Dr. Green's employment. We disagree.

¶ 32 Colorado courts have "declined to recognize the existence of an implied covenant of good faith and fair dealing in the context of otherwise at-will employment contracts." *Decker v. Browning-Ferris Indus. of Colo., Inc.*, 931 P.2d 436, 442 (Colo. 1997); *see also Pittman v. Larson Distrib. Co.*, 724 P.2d 1379, 1385-86 (Colo. App. 1986) (declining to extend the covenant to an oral contract for employment at-will). However, as our supreme court has recognized, the implied covenant of good faith and fair dealing "serves to protect the integrity of all of the promises made by the parties to [an] agreement setting forth the terms and conditions of employment." *Decker*, 931 P.2d at 443.

¶ 33    Accordingly, while a former employee can't bring a good faith and fair dealing claim to challenge an employer's termination of their at-will employment, they can bring such a claim to challenge an employer's failure to exercise good faith and fair dealing in the performance of its rights and obligations under a contract between the parties. *See, e.g., Soderlun v. Pub. Serv. Co. of Colo.*, 944 P.2d 616, 623 (Colo. App. 1997); *Oberhamer v. Deep Rock Water Co.*, No. CIVA 06-CV-02284-JLK, 2009 WL 1193737, at *10 (D. Colo. Apr. 29, 2009) (unpublished opinion); *Beal Corp. Liquidating Tr. v. Valleylab, Inc.*, 927 F. Supp. 1350, 1364 (D. Colo. 1996).

¶ 34    Here, Dr. Green hasn't asserted a good faith and fair dealing claim relating to at-will employment. If Dr. Green had been an at-will employee, defendants could've terminated his employment at any time and for any reason (other than an illegal one). *See Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 523 (Colo. 1996). But he wasn't, and they couldn't. Instead, the partner agreement and stock agreement set forth specific grounds on which termination could be based, as well as several other provisions regarding the terms and conditions of employment. Accordingly, Dr. Green's good faith and fair dealing claims — which are premised

14

on defendants' performance of their rights and obligations under the two agreements — are cognizable.

## IV.     Challenge to the Use of Discretionary Authority

¶ 35     We now consider defendants' assertion that Dr. Green didn't establish that defendants exercised discretionary authority under the partner agreement or stock agreement.  Again, we disagree.

### A.     Preservation

¶ 36     The parties dispute whether this issue was preserved.  We conclude that defendants sufficiently alluded to the issue in their directed verdict motion to bring the issue to the trial court's attention.  They then further developed the issue in their post-trial motion, which was styled as a motion for judgment notwithstanding the verdict and was denied.  Because this issue "was brought to the [trial] court's attention and the court ruled on it, it is preserved for appellate review." *In re Estate of Owens*, 2017 COA 53, ¶ 21.

### B.     Applicable Law and Standard of Review

¶ 37     "Each party to a contract has a justified expectation that the other will act in a reasonable manner in its performance."  *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994).  To that end, "[e]very contract . . . contains

15

an implied duty of good faith and fair dealing." *New Design Constr.
Co. v. Hamon Contractors, Inc.*, 215 P.3d 1172, 1181 (Colo. App.
2008) (quoting *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462,
466 (Colo. 2003)). A violation of this duty gives rise to a legal claim.
*City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006).

¶ 38    The duty of good faith and fair dealing applies "when the
manner of performance under a specific contract term allows for
discretion on the part of either party." *New Design Constr.*, 215
P.3d at 1181 (quoting *Parker*, 138 P.3d at 292); *see also Wells
Fargo*, 872 P.2d at 1363 ("When one party uses discretion conferred
by the contract to act dishonestly or to act outside of accepted
commercial practices to deprive the other party of the benefit of the
contract, the contract is breached.").

¶ 39    At its core, the duty of good faith and fair dealing "requires
only that the parties perform in good faith the obligations imposed
by their agreement." *Wells Fargo*, 872 P.2d at 1363. "Whether a
party acted in good faith is a question of fact to be determined on a
case-by-case basis." *Univ. of Denver v. Doe*, 2024 CO 27, ¶ 51.

¶ 40    We review de novo a trial court's denial of a motion for
judgment notwithstanding the verdict. *Parks v. Edward Dale*

16

*Parrish LLC*, 2019 COA 19, ¶ 9.  In doing so, "[w]e view the evidence, and all inferences that may reasonably be drawn therefrom, in the light most favorable to the nonmoving party."  *Id.* at ¶ 10.  A court shouldn't grant such a motion "unless there is no evidence that could support a verdict against the moving party on the claim."  *Id.*

### C.     Analysis

¶ 41      We conclude that Dr. Green presented enough evidence to support findings that defendants exercised discretionary authority under both the partner agreement and the stock agreement.

¶ 42      In particular, Dr. Green pointed to section 2.4 of the partner agreement, which, as we've indicated, required him to "successfully apply for and maintain in good standing provisional or active medical staff privileges at the [f]acility or [f]acilities to which [he was] assigned."  Although the agreement broadly defined "facilities," it didn't indicate what facility or facilities Dr. Green was assigned to, and defendants exercised discretion in determining, after Dr. Green returned from his medical leave of absence, which and how many facilities he needed to have privileges at and how quickly he had to regain those privileges.  Defendants resolved to allow

Dr. Green only four months after his return for recredentialing, but he testified that the process usually takes a minimum of three to six months and often up to a year.

¶ 43    Dr. Green also pointed to the following language in the compensation plan included in the partner agreement:

> Subject to established company guidelines and policies, Physician-Partner [c]ompensation shall be allocated . . . on a period basis through . . . a standard bi-monthly draw for employed Physician-Partners . . . *in each case subject to the GCA Clinical Governance Board and USAP . . . .*

(Emphasis added.)  Dr. Green testified that when he returned from his medical leave, defendants exercised discretion under this provision, in combination with the provision regarding assigned facilities, by opting to switch from paying him under the established partner formula to paying him an hourly rate due to his limited facility privileges.

¶ 44    Finally, Dr. Green pointed out that defendants could've opted to terminate him from the partnership based on the occurrence of a disability under section 6.2.4 of the partner agreement, as he advocated, rather than based on his limited credentialing.  Section 6.2.4 allowed defendants to terminate the agreement upon

18

Dr. Green's disability provided that, "as determined *in the sole discretion* of [the] Clinical Governance Board," a reasonable accommodation wasn't required, no reasonable accommodation would enable Dr. Green to safely and effectively perform his duties, or legally protected leave was inapplicable or had been exhausted. (Emphasis added.) Under this section, as well as the terms of the stock agreement, a "disability" could occur in any of three circumstances: (1) Dr. Green was entitled to payments under his disability policy; (2) he was unable to resume his "normal and complete duties" within 180 days after a disabling event or after thirty consecutive work days of being unable to perform his duties; or (3) he didn't perform his duties for 180 days during a 360-day period. Dr. Green presented evidence that defendants exercised discretion by refusing to consider the second or third definitions of a "disability," deeming his conditions not "disabilities," and declining to apply the provisions of the partner agreement and stock agreement that could've enabled him to retain his unvested stock when he left the partnership.

¶ 45    Therefore, we cannot conclude that the trial court erred in denying defendants' motion for judgment notwithstanding the verdict on this basis.

## V.    Sufficiency of the Evidence

¶ 46    Next, we assess defendants' challenge to the sufficiency of the evidence supporting the jury's verdict for Dr. Green on his good faith and fair dealing claims.  Defendants argue that there wasn't enough evidence to support a finding that Dr. Green substantially performed or was excused from his performance of the partner agreement.  We are not persuaded.

### A.    Preservation

¶ 47    The parties dispute whether defendants adequately preserved this issue through their motion for a directed verdict, given that they didn't raise the issue again in their post-trial motion.  As Dr. Green points out, under the federal civil rules, in order to preserve a sufficiency of the evidence argument, a party must make a post-trial motion under Fed. R. Civ. P. 50(b).  *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400-01 (2006).  But, as defendants point out, C.R.C.P. 50 and 59 are different from their federal counterparts, and C.R.C.P. 59(b) expressly provides that

"[f]iling of a motion for post-trial relief shall not be a condition precedent to appeal . . . , nor shall filing of such motion limit the issues that may be raised on appeal."

¶ 48    We need not decide this issue, however, because regardless, we conclude that the evidence supports the jury's verdict.

## B.    Applicable Law and Standard of Review

¶ 49    We review sufficiency of the evidence challenges de novo. *Northstar Project Mgmt., Inc. v. DLR Grp., Inc.*, 2013 CO 12, ¶ 14.  In doing so, "we must determine whether the evidence, viewed as a whole and in the light most favorable to the prevailing party, is sufficient to support the verdict."  *Parr v. Triple L & J Corp.*, 107 P.3d 1104, 1106 (Colo. App. 2004).  We also must "draw every reasonable inference from the evidence in favor of [the prevailing] party."  *Averyt v. Wal-Mart Stores, Inc.*, 2013 COA 10, ¶ 18 (quoting *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1201 (Colo. App. 2009)).  It is the jury's sole prerogative to resolve disputes of fact and to determine the weight of the evidence, the inferences to be drawn from it, and the credibility of the witnesses.  *Fisher v. State Farm Mut. Auto. Ins. Co.*, 2015 COA 57, ¶ 40, *aff'd on other grounds*, 2018 CO 39.  Thus, we won't disturb a jury's verdict if there is

evidence in the record to support it, even if reasonable people could reach a different conclusion based on the same evidence. *Id.*; *People in Interest of S.G.L.*, 214 P.3d 580, 583 (Colo. App. 2009).

## C.    Analysis

¶ 50    Defendants contend that a plaintiff pursuing a good faith and fair dealing claim must demonstrate either substantial performance of their contractual duties or justification for nonperformance. To support this contention, they rely on an unpublished federal case, *McNees v. Ocwen Loan Servicing, LLC*, 853 F. App'x 211, 217 (10th Cir. 2021). Substantial performance (or excuse for nonperformance) certainly is required for an express breach of contract claim. *See McDonald v. Zions First Nat'l Bank, N.A.*, 2015 COA 29, ¶ 50; *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). However, *McDonald* and *Western Distributing Co.*, the two Colorado cases the court in *McNees* relied on, don't indicate that the same requirement applies to implied covenant of good faith and fair dealing claims, and we are aware of no other Colorado case law supporting that contention.

¶ 51    Nevertheless, assuming, without deciding, that a showing of substantial performance or excuse from performance is required,

we conclude that the evidence presented at trial supports such a finding in this case.

¶ 52    "A party has substantially performed when the other party has substantially received the expected benefit of the contract." *McDonald*, ¶ 50 (quoting *Stan Clauson Assocs., Inc. v. Coleman Bros. Constr., LLC*, 2013 COA 7, ¶ 9).  Conversely, "[d]eviation from contract duties in trifling particulars that do not materially detract from the benefits the obligee would have derived from literal performance does not constitute a material breach."  *Stan Clauson*, ¶ 9.  And "[a] party may establish justification for nonperformance under a contract if [they] demonstrate[] that the other party to the contract caused [their] nonperformance."  *Hemmann Mgmt. Servs. v. Mediacell, Inc.*, 176 P.3d 856, 859 (Colo. App. 2007).

¶ 53    Defendants argue that Dr. Green failed to substantially perform his obligations under sections 2.1 and 2.4 of the partner agreement.  Pursuant to section 2.1, Dr. Green's duties included, among other things, "participation in on-call rotation for afterhours coverage as developed by GCA, if applicable."  And, again, section 2.4 required Dr. Green to "successfully apply for and maintain in

good standing provisional or active medical staff privileges at the [f]acility or [f]acilities to which [he was] assigned by GCA."

¶ 54 Defendants cite evidence that could've supported jury findings that Dr. Green breached these provisions by failing to regain privileges at several facilities. But the provisions are vague and unspecific, and the parties disputed at trial what facility or facilities Dr. Green had been assigned to within the meaning of section 2.4, which or how many facilities he needed to have privileges with to fulfill his obligation to participate in the on-call rotation, and how much time he was entitled to take to regain his privileges.

¶ 55 Thus, notwithstanding defendants' contrary evidence, the jury could've found that Dr. Green either substantially performed his obligations under the partner agreement or was excused in that performance based on trial evidence such as the following:

- After Dr. Green returned from his medical leave of absence, he worked eighty to a hundred hours per week.

- Dr. Green could've taken on-call work at those facilities where he'd regained his privileges, but he wasn't scheduled to do so.

- Dr. Green regained his privileges at several facilities and made significant efforts to regain privileges at others but struggled to do so without assistance from defendants.

- Defendants withheld from Dr. Green communications from facilities regarding compliance requirements to regain his practice privileges.

¶ 56     Viewed in the light most favorable to Dr. Green, *see Parr*, 107 P.3d at 1106, this evidence sufficiently supports the jury verdict. Accordingly, we will not disturb the verdict on this basis.

¶ 57     Finally, we note that any error was harmless.  *See* C.R.C.P. 61; *Bly*, 241 P.3d at 535.  Dr. Green argued at trial that defendants violated their good faith obligations under both the partner agreement and the stock agreement, and because of the jury's general verdict, we don't know whether the jury found for Dr. Green based on one or both of those agreements.  But if the verdict was based on the stock agreement, any error relating to the evidence regarding the partner agreement would've had no impact on it.

## VI.    Jury Instructions and Verdict Form

¶ 58     We next consider — and reject — defendants' related argument that a new trial is required because the jury instructions

and verdict form failed to require Dr. Green to prove either substantial performance of his contractual duties or a justification for nonperformance in order to recover for breach of the duty of good faith and fair dealing.

## A. Preservation

¶ 59 The parties again contest preservation. We conclude that defendants adequately raised their concerns with the trial court so as to preserve the issue, particularly by proffering a verdict form that included this element, objecting to Dr. Green's proposed verdict form on the basis that it didn't do so, and suggesting that in the alternative to their proposed verdict form they could address the issue through an interrogatory to the jury. *See Migoya v. Wheeler*, 2024 COA 124, ¶ 39 ("If a party raises an argument to such a degree that the court has the opportunity to rule on it, that argument is preserved for appeal." (quoting *Madalena*, ¶ 50)).

## B. Applicable Law and Standard of Review

¶ 60 We review de novo whether jury instructions and verdict forms, as a whole, accurately inform jurors of the governing law and their obligations as fact finders. *Bullington v. Barela*, 2024 COA 56, ¶ 17 (jury instructions); *People v. Miller*, 2024 COA 66, ¶ 39 (verdict

26

forms).  But we review a trial court's decision to give a particular instruction or question on a verdict form for an abuse of discretion. *See Bullington*, ¶ 17; *Williams v. Chrysler Ins. Co.*, 928 P.2d 1375, 1377-78 (Colo. App. 1996).  A court abuses its discretion in this context if its decision is manifestly arbitrary, unreasonable, or unfair.  *Mosley v. Daves*, 2025 COA 80, ¶ 12.  It isn't error for a court to refuse to give a particular instruction or verdict form question, "even if correct in legal effect, if the other instructions [and questions] given adequately inform the jury of the applicable law."  *Peterson v. Tadolini*, 97 P.3d 359, 360 (Colo. App. 2004).

## C.    Analysis

¶ 61    Defendants assert that the trial court failed to inform the jury, through its instructions and verdict form, that Dr. Green couldn't prevail on any claim for breach of the duty of good faith and fair dealing if he had already materially breached the relevant contract.

¶ 62    Defendants again support their legal argument based on a single unpublished federal case.  *See McNees*, 853 F. App'x at 217.  Nonetheless, assuming, without deciding, that Dr. Green couldn't prevail on his good faith and fair dealing claims if he had committed

27

a prior material breach, we conclude that the instructions adequately conveyed that limitation.

¶ 63    The trial court informed the jury, in Instruction 33, that "[a]ll the instructions must be read and considered together." Instruction 17 — which set forth the defense of material breach — instructed the jury that "[a] party to a contract cannot claim its benefit where the party is the first to violate its terms" and that "[a] material breach by one party excuses performance by the other party to the contract." And Instruction 25 — which set out the law on good faith and fair dealing — instructed the jury that "[e]very contract requires the parties to act in good faith and to deal fairly with each other in performing or enforcing the express terms of the contract" and that "[t]he duty of good faith and fair dealing is breached when a party acts contrary to th[e] agreed common purpose and the parties' reasonable expectations."

¶ 64    Reading Instructions 17 and 25 together, as it was required to do, the jury would've understood that Dr. Green couldn't claim a benefit from a contract, including as to his good faith and fair dealing claims, if he was the first to violate that contract. Likewise, the jury would've understood that if Dr. Green had materially

28

breached a contract, the performance of any other parties to that contract would've been excused and they no longer would've had any obligation to act in good faith with respect to the contract.

¶ 65    We thus conclude that the instructions as a whole adequately informed the jury of the law.  *See Tadolini*, 97 P.3d at 360.

## VII.   Non-Party to the Contracts

¶ 66    Next, we consider USAP-National's argument that it was entitled to judgment notwithstanding the verdict because it was not a party to either the partner agreement or the stock agreement and thus couldn't be liable for any breach of the duty of good faith and fair dealing with regard to either agreement.  We are not persuaded.

### A.    Applicable Law and Standard of Review

¶ 67    Where no contract exists between parties, "no claim for breach of the covenant of good faith and fair dealing may stand."  *Lutfi v. Brighton Cmty. Hosp. Ass'n*, 40 P.3d 51, 59 (Colo. App. 2001); *see also Barbara's Lighting Ctr., Inc. v. Churchill*, 540 P.2d 1110, 1111 (Colo. App. 1975) ("Generally, a contract can be enforced only against a party to that contract.").

29

¶ 68    As before, we view the evidence and all inferences that might reasonably be drawn from it in the light most favorable to Dr. Green.  *See Parks,* ¶ 9.

### B.    Analysis

¶ 69    We discern no error in the trial court's denial of USAP-National's motion, as it was unclear at trial exactly who were the parties to the two agreements at the time in question.

¶ 70    The original parties to the partner agreement were Dr. Green and GCA, but the agreement provided that it would "inure to the benefit of and be binding on" the parties as well as their "successors and assigns."  USAP-National asserts that USAP-Colorado is the successor to GCA and, therefore, that only the Colorado entity — and not the national entity — was bound by the agreement. Similarly, USAP-National asserts that it was not a party to the stock agreement, which was between Dr. Green and an entirely different entity: U.S. Anesthesia Partners Holdings, Inc.

¶ 71    As to the partner agreement, USAP-National relies largely on the joint stipulation, which was provided to the jury, that Dr. Green entered into that agreement "with USAP-Colorado (then known as [GCA])."  The joint stipulations also provided that USAP-National "is

a national network of anesthesia providers with over 3,500 clinical representatives located in" various states, including Colorado; that USAP-National "created USAP-Colorado as a result of mergers and acquisitions involving" GCA and another group; and that "USAP-Colorado is an organization that employs physicians in Colorado." And, as to the stock agreement, USAP-National argues that it is not the stock-issuing entity that entered the agreement.

¶ 72 But, as Dr. Green points out, the jury was also instructed that "*[d]efendants* notified Dr. Green that [the partner agreement] was terminated" and that it was defendants' position that the partner agreement "allowed *the defendants* to terminate the contract early." (Emphases added.)  The instructions also repeatedly referenced the two defendants collectively as "USAP."

¶ 73 And the evidence at trial was murky, at best, as to what the relationship was between GCA, USAP-Colorado, USAP-National, and U.S. Anesthesia Partners Holdings, Inc.  Throughout the trial, counsel and the witnesses meandered back and forth between using "USAP-Colorado" and "USAP-National" and simply using the generic "USAP," without any explanation.  The repeated use of "USAP" when discussing the agreements and the entities' actions —

31

particularly combined with the instructions' referring to defendants jointly as "USAP" — may have suggested to the jury that both defendants took on GCA's obligations under the partner agreement and were somehow related to or part of U.S. Anesthesia Partners Holdings, Inc. such that they were parties to the stock agreement.

¶ 74    For instance:

- Dr. Green repeatedly testified that GCA was "acquired by USAP" and that, as a result of the acquisition, he "bec[a]me a partner in USAP." He also testified that he entered the stock agreement "with USAP." At one point, he said that "USAP" is "a national company."

- A former colleague of Dr. Green's and former member of the Clinical Governing Board similarly testified that "USAP bought out [GCA]" and "USAP . . . acquir[ed] the practice," after which she and Dr. Green were both "employed by USAP." She also explained that "although we were a local practice, we were employed by the national corporation."

- The chair of GCA's Clinical Governing Board at the time of the merger — who served as a defense witness — also testified that "GCA was acquired by USAP."

- A former colleague of Dr. Green's who had since become president of USAP's clinical operations — and who also served as a defense witness — at times vaguely referred to "the acquisition of GCA by USAP" and to the physicians working at "USAP."

- Two corporate witnesses who testified for defendants referred to working for "USAP." One of them also testified that physician groups "would sell their practice in exchange for cash and stock and become part of USAP."

¶ 75    Also, the partner agreement contains various references to "USAP," which the agreement defines as USAP-National.

¶ 76    At no point did any witness — including any of defendants' corporate witnesses — attempt to clarify the relationship between the entities. Nor did any witness reference U.S. Anesthesia Partners Holdings, Inc. as a distinct entity.

¶ 77    Given the murkiness of the evidence concerning the USAP corporate entities, the evidence could support findings that USAP-

National was a party to the two agreements. Accordingly, the trial court didn't err in denying USAP-National's motion for judgment notwithstanding the verdict on this basis.

## VIII. Modification of Damages

¶ 78 We now consider an issue raised both in defendants' appeal and Dr. Green's cross-appeal: the trial court's entry of judgment for $1 on Dr. Green's good faith and fair dealing claim against USAP-Colorado. We reject USAP-Colorado's arguments in its appeal and dismiss Dr. Green's cross-appeal.

### A. Additional Background

¶ 79 Jury Instruction 30 informed the jury:

> If you find in favor of the plaintiff, Dr. Richard Green, on his claims of . . . breach of implied covenant of good faith and fair dealing, then you must award him damages.
>
> To award damages, you must find by a preponderance of the evidence that the plaintiff had damages as a result of the breach, and you must determine the amount of those damages.
>
> *If you find in favor of the plaintiff, but do not find any damages, you shall award plaintiff nominal damages.*

(Emphasis added.)

34

¶ 80    The verdict form separately asked the jury if it found in favor of Dr. Green and against each of the two defendants on the good faith and fair dealing claims. The jury answered both questions "yes." The verdict form then instructed that if the jury answered "yes" to any of the previous questions, it was to "[s]tate below," in boxes separated out as to each claim and each defendant, "the amount of dollars that will compensate [Dr. Green] for his damages that were the natural and probable consequences of" the breach.

¶ 81    During deliberations, the jury asked, "If awarding damages, do we place the total damages in each box or do we separate the dollar amount per question/per defendant?" In response, the court directed the jury to refer to Instruction 20, which stated,

> The plaintiff, Dr. Richard Green, has sued for the same damages on two different claims for relief. The claims for relief on which the plaintiff has sued and on which you have been instructed are: breach of contract, and breach of the implied duty of good faith and fair dealing.
>
> If you find for the plaintiff on more than one claim for relief, you may award him damages only once for the same losses.

¶ 82     As we've noted, the jury awarded $1.9 million in damages against USAP-National for the good faith and fair dealing claim but left the damages section in the box for USAP-Colorado blank.

¶ 83     Pursuant to the jury verdict, the trial court issued an "entry of judgment" entering judgment in favor of Dr. Green and against USAP-Colorado without any reference to damages and entering judgment in favor of Dr. Green and against USAP-National in the amount of $1.9 million.

¶ 84     Dr. Green filed a motion, purportedly for judgment notwithstanding the verdict, regarding the damage award against USAP-Colorado.  He argued that because the jury found in favor of him and against USAP-Colorado on his good faith and fair dealing claim, the jury was required to award damages against USAP-Colorado.  Thus, he asked the court to enter judgment in his favor and against USAP-Colorado for nominal damages of $1.  More than a hundred days later, the court entered an order granting his request and entering the requested $1 judgment.

## B.     Analysis

¶ 85     We first dispose of the parties' arguments concerning the date the trial court entered its order granting Dr. Green's motion.  Part of

USAP-Colorado's argument and the entirety of Dr. Green's cross-appeal argument are based on the assumption that the motion was deemed denied after sixty-three days under Rule 59(j), such that the trial court no longer had jurisdiction to rule on it. *See De Avila v. Est. of DeHerrera*, 75 P.3d 1144, 1146 (Colo. App. 2003).

¶ 86 A motions division of this court has already concluded that "the final judgment in this matter" wasn't entered until September 17, 2024, the date the trial court ruled on Dr. Green's motion concerning the damage award. We agree.

¶ 87 "To be considered final, a judgment or order must address both liability and damages, and damages must be reduced to a sum certain." *Stone Grp. Holdings LLC v. Ellison*, 2024 COA 10, ¶ 18 (citation omitted). Because the initial "entry of judgment" in favor of Dr. Green and against USAP-Colorado didn't address damages, it wasn't a final judgment. Thus, Dr. Green's motion concerning the damage award wasn't in fact a Rule 59 motion and wasn't deemed denied by operation of Rule 59(j). Indeed, not only did the trial court not lose jurisdiction to resolve the motion, it *had to* resolve the issue raised in the motion in order to effectuate a final judgment.

¶ 88     Accordingly, we reject USAP-Colorado's argument that the trial court lacked jurisdiction to consider Dr. Green's motion.

¶ 89     We now turn to USAP-Colorado's other arguments challenging the trial court's entry of judgment for $1. USAP-Colorado argues that (1) the court fundamentally altered the jury's decision to only award damages against USAP-National; (2) Dr. Green needed to have objected to the verdict before the jury was discharged; and (3) the order constituted an improper use of additur. We disagree.

¶ 90     First, the court didn't fundamentally alter the jury's decision. Instead, it corrected a technical error in the jury's verdict. A court generally may amend a verdict with respect to matters of form — changes that correct a technical error made by the jury — but not matters of substance — changes that affect the jury's underlying determination. *Weeks v. Churchill*, 615 P.2d 74, 75 (Colo. App. 1980). And under the law, as well as the court's instructions, the jury was required to award nominal damages against USAP-Colorado after it found that USAP-Colorado breached its duty of good faith and fair dealing and apparently found that Dr. Green wasn't harmed as a result of that breach. *See Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 818 (Colo. App.

2003) ("When a plaintiff establishes breach, but does not prove actual damages, the plaintiff is entitled to nominal damages."). Because the jury didn't do so, it was appropriate for the court to correct the error as it did, in a way that didn't alter either the jury's finding that USAP-Colorado committed a breach or its apparent finding that Dr. Green didn't suffer any resulting damages.[3]

¶ 91    Second, while a party must "object to a general verdict . . . before the jury is discharged" if they believe there are inconsistencies in the verdict, *In re Estate of Chavez*, 2022 COA 89M, ¶ 31, Dr. Green didn't seek to challenge any inconsistency in the jury's verdicts. Instead, he sought to correct a technical error. Therefore, there was no need to raise the issue before the jury was

---

[3] The jury may have been confused by the verdict form, coupled with the instructions and the trial court's response to its question about damages. While the court's response and the underlying instructions were technically correct, the verdict form required the jury to separately award damages on each claim and as to each defendant. Thus, once the jury had awarded damages against USAP-National, it may have felt that the instruction to "award . . . damages only once for the same losses" prevented it from entering any amount at all against USAP-Colorado. But regardless of what led to the jury's failure to follow the trial court's instructions regarding nominal damages, it was proper for the court to fix it.

discharged.  And, as we've indicated, the issue needed to be resolved before the judgment could be deemed final.

¶ 92     And third, USAP-Colorado didn't raise its additur argument in the trial court.  USAP-Colorado suggests that it didn't have an opportunity to address the issue there.  But it filed a response to Dr. Green's motion in which it raised its other arguments and could've raised this one as well.  Accordingly, we consider the argument not preserved and decline to consider it.  *See City & County of Denver v. Bd. of Cnty. Comm'rs*, 2024 CO 5, ¶ 70.

¶ 93     Finally, we dismiss as moot Dr. Green's appeal, in which he challenges the trial court's denial of his motion by operation of Rule 59(j) and asks us to remand the case with instructions to award him nominal damages of $1.  Our conclusion that the trial court has already properly taken this action moots the relief Dr. Green seeks on appeal.  *See Oracle Corp. v. Dep't of Revenue*, 2017 COA 152, ¶ 68 (a party's cross-appeal was moot because, based on the division's disposition of the appeal, the party "would not be entitled to any additional relief"), *aff'd on other grounds*, 2019 CO 42.

IX.    Attorney Fee and Cost Award

¶ 94    We now turn to defendants' challenge to the trial court's award of attorney fees and costs to Dr. Green.  Defendants don't challenge the amount of the award.  Instead, their challenge is limited to the trial court's determination that Dr. Green is the prevailing party and, thus, that he is entitled to an award of attorney fees and costs under the partner agreement.  We reject their challenge.

A.    Applicable Law and Standard of Review

¶ 95    Colorado courts follow the American rule, which, absent an exception, requires parties to a lawsuit to pay their own legal expenses.  *S. Colo. Orthopaedic Clinic Sports Med. & Arthritis Surgeons, P.C. v. Weinstein*, 2014 COA 171, ¶ 10.  Through a fee-shifting provision, however, the parties to a contract may agree that, in the event of litigation, the prevailing party will be entitled to recover their attorney fees and costs.  *Id.*

¶ 96    The determination of which party prevailed is committed to the trial court's discretion.  *Lawry v. Palm*, 192 P.3d 550, 569 (Colo. App. 2008).  Thus, we review the court's prevailing party decision for an abuse of discretion and "will not disturb such a decision if it is supported by the record."  *Whiting-Turner Contracting Co. v.*

*Guarantee Co. of N. Am. USA*, 2019 COA 44, ¶ 56; *see also Anderson v. Pursell*, 244 P.3d 1188, 1194 (Colo. 2010) (recognizing that "the trial court is in the best position to observe the course of the litigation and to determine which party ultimately prevailed").

¶ 97 In making a prevailing party determination, a trial court "should examine the overall context of the case and should consider where in the case the parties spent the majority of their time and resources." *Anderson*, 244 P.3d at 1194 (citation omitted). "[T]he number of claims upon which a party prevails and the amount awarded for such claims are not determinative of who is the prevailing party . . . ." *Grynberg v. Agri Tech, Inc.*, 985 P.2d 59, 64 (Colo. App. 1999), *aff'd*, 10 P.3d 1267 (Colo. 2000). Nonetheless, the prevailing party "must succeed on a significant issue in the litigation and achieve some of the benefits sought." *Anderson*, 244 P.3d at 1194.

## B. Additional Background

¶ 98 Dr. Green sought attorney fees pursuant to section 11.3 of the partner agreement, which provides,

> In the event that either party commences an action to enforce or seek a declaration of the parties' rights under any provision of this

> Agreement, the prevailing party shall be entitled to recover its legal expenses, including, without limitation, reasonable attorneys' fees, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled.

¶ 99    Green also requested his costs under this same section, as well as C.R.C.P. 54(d), which permits the prevailing party in litigation to recover their reasonable costs.

¶ 100   The trial court determined that section 11.3 of the partner agreement applies to this case and that Dr. Green is the prevailing party. The court accordingly awarded him $541,644.36 in attorney fees. The court also agreed that he is entitled to costs pursuant to Rule 54(d) and awarded him $49,637.52 in costs.[4]

## C.    Analysis

¶ 101   Because Dr. Green was successful on his good faith and fair dealing claims against both defendants and achieved some of the benefits he sought in this case, including a damage award of $1.9

---

[4] Dr. Green filed a motion for reconsideration of this award, seeking additional fees. 104 days later, the court entered a void order awarding Green an additional $41,930 in attorney fees. *See* C.R.C.P. 59(j); *De Avila v. Est. of DeHerrera*, 75 P.3d 1144, 1146 (Colo. App. 2003). While defendants noted this issue in a notice regarding supplemental briefing, the ruling on Dr. Green's motion for reconsideration is not a part of this appeal.

million, we conclude that the trial court didn't abuse its discretion in determining that he is the prevailing party.

¶ 102 We reject defendants' contrary arguments as follows:

- We are not convinced that the trial court failed to apply the correct standard for determining the prevailing party. The court cited the appropriate standard, and there is nothing in its order suggesting that it failed to apply that standard in its ruling.

- It was within the trial court's discretion to find Dr. Green the prevailing party, notwithstanding that he didn't prevail on his contract claims, as he prevailed on his good faith and fair dealing claims and obtained much of the benefit he sought from the lawsuit.

- It was within the trial court's discretion to find Dr. Green the prevailing party as to USAP-Colorado, even though he didn't recover any damages against that entity. *See Regency Realty Invs., LLC v. Cleary Fire Prot., Inc.*, 260 P.3d 1, 6 (Colo. App. 2009) (a party may be the prevailing party even if they didn't recover any damages).

- As we've noted, there was sufficient evidence at trial to support a finding that USAP-National was subject to the partner agreement as an assignee or successor to GCA.

¶ 103    Therefore, we decline to disturb the trial court's decision.

## X.    Appellate Attorney Fees and Costs

¶ 104    Lastly, we consider both sides' requests for appellate attorney fees and costs under the partner agreement's prevailing party provision.  Because we affirm the judgment entered in favor of Dr. Green, we grant Dr. Green's request and deny defendants' request.  We exercise our discretion to remand the case to the trial court to determine the amount of reasonable appellate attorney fees and costs to be awarded to Dr. Green.  *See* C.A.R. 39.1.

## XI.    Disposition

¶ 105    Dr. Green's cross-appeal is dismissed.  The judgment and the order awarding attorney fees and costs are both affirmed, and the case is remanded to the trial court to determine the amount of appellate attorney fees and costs to be awarded to Dr. Green.

JUDGE PAWAR and JUDGE BERNARD concur.